UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| Alicia BELTRAN<br><br>    Applicant,<br><br>    vs.<br><br>Jamie LOEHNIS, in his official capacity as<br>Executive Director of the Casa Clare<br>Treatment Center; Jim STRACHOTA,<br>in his official capacity as Director of Human<br>Services for Washington County, WI;<br>Mark D. BENSEN, in his official capacity as<br>District Attorney for Washington County,<br>WI; the WASHINGTON COUNTY<br>CIRCUIT COURT; and John DOE, in his<br>official capacity as immediate custodian<br>of Applicant Alicia Beltran,<br><br>    Respondents. | Docket No. _____ |

Declaration of Deborah A. Frank, M.D.

I, Dr. Deborah Frank, declare and state as follows:

1. I received my M.D. from Harvard Medical School and am Board Certified in Pediatrics and Developmental Behavioral Pediatrics. I am licensed to practice medicine in Massachusetts. I am a Professor of Child Health and Wellbeing in the Department of Pediatrics at Boston University School of Medicine, where I have been teaching since 1981. I am also the Founder and Director of the Grow Clinic at Boston Medical Center, and Principal Investigator of the Children's Health Watch (www.childrenshealthwatch.org), formerly known as Children's Sentinel Nutrition Assessment Program ("C-SNAP"). Children's Health Watch goal is to monitor the impact of policy changes on nutrition, growth and

1

development of low-income children, ages 0-4 years. I have also since 1990 conducted research funded by the National Institute on Drug Abuse grant DA06532 on the impact of prenatal exposure to cocaine and other substances on children's well being. At the request of U.S. Senators and Congressmembers, I have given testimony to the United States House and Senate. I testified regarding the impact of prenatal cocaine exposure before the United States Sentencing Commission Regarding Drug Penalties, February 25, 2002.

2. I am the author of numerous peer-reviewed and published scientific articles and papers including, Deborah A. Frank et al., *Maternal Cocaine Use: Impact on Child Health and Development*, 40 Advances in Pediatrics 65 (1993). I am also the author of the seminal systematic review published by the Journal of the American Medical Association ("JAMA"), Deborah A. Frank et al., *Growth, Development, and Behavior in Early Childhood Following Prenatal Cocaine Exposure: A Systematic Review*, 285 JAMA 1613 (2001).

3. I have also served on numerous committees and advisory boards and received awards recognizing my dedication to and advocacy on behalf of children in need. My Curriculum Vitae is attached as Exhibit A.

4. I have reviewed the medical, social work, and substance abuse treatment records of Alicia Beltran available to me to ascertain 1) whether the information the state relied upon provides a basis for concluding that Ms. Beltran's use of controlled substances was to an "extent" that there was or is currently "a substantial risk that the physical health of the unborn child, and of the child when born, will be

2

seriously affected or endangered" and 2) to determine whether the actions taken by the state advanced fetal, or child health

5. Based on the information available, Ms. Beltran was highly motived to obtain prenatal care early in her pregnancy, to address whatever problem she believed she had with regard to her previous use of painkillers and to significantly reduce her cigarette use.

6. All records indicate that her drug use was intermittent not habitual.

7. On July 2, 2013, Ms. Beltran went to West Bend Clinic at St. Joseph's Hospital in West Bend, Wisconsin, for prenatal care, where she was examined by Stephanie Weiss a physician's assistant. In the context of obtaining health care, Ms. Beltran disclosed her experiences with use of Percocet and Vicodin and her self-help efforts to stop use of those drugs through the use of Suboxone. Ms. Beltran reported that she had been successful in weaning herself off of Percocet and other related substances. A drug test administered that day was consistent with Ms. Beltran's self-report that the only drug she had taken recently was Suboxone: because of the long period of excretion of Suboxone, the positive result does not necessarily mean that she had taken the medication on July 2, 2013. Many people, especially those who face barriers to health care self-medicate with medications prescribed for others.

8. Ideally, a pregnant woman with an opiate addiction would be medically managed, receiving prescribed Suboxone and continuing it through her pregnancy, or undergoing detoxification under medical supervision. While these approaches would be ideal, nothing in the medical records indicate that Ms. Beltran's

3

approach was creating a substantial risk to the physical health of the unborn child, and of the child when born.

9. While use of opiates and treatments for opiate addiction potentially impact a developing fetus and a child once born, these impacts reflect statistical possibilities. Evidence of drug use – admissions and/or positive drug tests are not, as a matter of science, the same as evidence of harm, or even evidence of a substantial risk of harm in any specific pregnancy. Engagement in prenatal care, which Ms. Beltran initiated, is an established method of minimizing risk of harm, if any.

10. When women continue opiate use throughout pregnancy, or are receiving methadone or Suboxone treatment, the newborn may experience what is called neonatal abstinence syndrome ("NAS"). This is a transitory and treatable condition. It is not possible to predict in any given woman's pregnancy the severity of NAS or even that it will occur at all in the newborn. Moreover, while abrupt withdrawal from opiates creates concern that a miscarriage could result, there is no medical indication in Ms. Beltran's case that there was abrupt withdrawal or any harm to the developing fetus. Rather she purposefully seems to have gradually and successfully withdrawn herself. Congenital malformations (inaccurately referred to by Ms Liddicoat as "congenital defects,") are not thought to be associated with opiate exposure in human pregnancies.

11. The following specific records indicate that there was no medical evidence of a substantial risk that the physical health of the unborn child, and of the child when born, would be seriously affected or endangered:

4

- the 5/21/13 Ultrasound, which showed at that very early point the fetus was developing normally for dates;
- the 7/18/13 assessment by St. Joseph emergency department physician Dr. Amoroso, which stated, "The patient's exam is largely benign and does not reveal any acute medical issues. Specifically, none of the patient's vitals or other observations during the exam are consistent with any sort of withdrawal. Fetal heart tone were assessed and found to be within the 150s" (appropriate for estimated gestational age); and
- the 7/23/13 Casa Clara admitting assessment showing that Ms. Beltran was not in withdrawal.

12. As far as available records show, Ms. Beltran had no drug-related pregnancy complications, including no evidence on blood tests of HIV, hepatitis, or syphilis. Ms. Beltran did have vaginitis and a urinary tract infection, conditions that are extremely common in pregnant women regardless of substance use. Both conditions were treated. I do not have access to recent prenatal assessments of mother, except the note by Mr. Borden, a substance abuse counselor, on 8/20/13 that mother has been abstinent for 30 days and had no symptoms attributable to substance misuse or to withdrawal. This suggests that any potential theoretical risk to the developing fetus from either opiates or opiate withdrawal were not a concern for this mother at that time.

13. Ongoing prenatal care is crucial for optimizing the course of pregnancy and the well being of mother and fetus. Trust plays a critical role in seeking and

5

continuing to follow up with prenatal care. Fear of arrest and loss of child custody are widely recognized to undermine this.

14. Indeed, if Ms. Beltran had not been so conscientious in seeking early prenatal care, she might have delayed care until she successfully achieved total abstinence from drug use and avoided the possibility of arrest or detention under the Wisconsin law. From a medical perspective the impact of this case demonstrates the perverse perinatal health implications of laws like these – creating incentives for delaying prenatal care or avoiding it altogether.

15. Stress and anxiety in pregnancy, such as arrest or involuntary detention (or even stress in the work place), has been correlated with negative pregnancy outcomes including miscarriage and low birth weight (See Muldar 2002, Attached as Exhibit B).

16. From a health perspective, over-focus on use of illicit controlled substances in pregnancy as a sole and predictable cause of fetal harm is not supported by medical evidence from either a public health or a clinical perspective. Use of illicit substances is only one of many potential risk factors. Prenatal exposures to alcohol and tobacco (both legal), victimization, many prescribed medications, inadequate dietary quality or quantity, lack of prenatal care, stress, homelessness, standing long periods at work, and poverty itself all contribute to suboptimal outcomes on a population level, although the contribution of any individual factor in an individual case may be impossible to determine. Rather care of all pregnant women, whether they use illicit substances or not, should be comprehensive and supportive. Most women are non-adherent to some medical recommendations in

6

pregnancy, whether they do not take their folate pills before or soon after conception (which can increase the risk of neural tube and other birth defects) or continue to use tobacco (which extensive medical research has established as associated with increased risk of miscarriage, still birth, low birth weight and long term developmental effects such as externalizing behavior disorders) or miss prenatal appointments, but it is certainly not routine for physicians to refer non-adherent women for arrest or involuntary interventions. Punitive approaches that frighten women away from seeking prenatal care and from developing a trusting and positive relationship with health care providers that facilitates positive health behaviors are counterproductive for the individual pregnancy and for the society as a whole.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on September __20____, 2013

*Deborah A. Frank*
Deborah A. Frank, M.D.

7