# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| **Alicia BELTRAN** | ) | |
| | ) | |
|     **Applicant,** | ) | |
| | ) | Docket No._____ |
|     vs. | ) | |
| | ) | |
| **Jamie LOEHNIS, in his official capacity as** | ) | |
| **Executive Director of the Casa Clare** | ) | |
| **Treatment Center; Jim STRACHOTA,** | ) | |
| **in his official capacity as Director of Human** | ) | |
| **Services for Washington County, WI;** | ) | |
| **Mark D. BENSEN, in his official capacity as** | ) | |
| **District Attorney for Washington County,** | ) | |
| **WI; the WASHINGTON COUNTY** | ) | |
| **CIRCUIT COURT; and John DOE, in his** | ) | |
| **official capacity as immediate custodian** | ) | |
| **of Applicant Alicia Beltran,** | ) | |
|     **Respondents.** | ) | |

Declaration of Charles W. Schauberger, M.D.

I, Dr. Charles W. Schauberger, do declare:

1. I am a board-certified obstetrician-gynecologist licensed to practice medicine in Wisconsin and Iowa. Since 1982, I have provided obstetric and gynecological care, particularly to women with drug addictions, at Gundersen Lutheran Medical Center in La Crosse, Wisconsin. Between 2000 and 2005, I served as Medical Director for Quality and Performance Improvement at Gundersen Lutheran, and was a member of the Board of the Wisconsin Patient Safety Institute and the Risk Management Committee for the Patient Compensation Fund in Wisconsin. I have served in many administrative and clinical roles, including Chairman of the Patient Safety Council, Chairman of the Medicolegal Affairs Committee, and Medical Director of the Gundersen Lutheran Health Plan.

2. I earned my B.S. from Iowa State University in 1970. I earned my doctorate in medicine from the University of Iowa Medical School in 1978. I completed a residency in obstetrics and gynecology at the University of Iowa.

3. I am a Fellow of the American College of Obstetricians and Gynecologists ("ACOG") and a member of the American Society of Addiction Medicine ("ASAM"). I have been a member of the Central Association of Obstetricians and Gynecologists since 1990 and currently serve on its Program Committee. I have been certified as a physician executive (CPE) by the American College of Physician Executives and hold a master's degree in medical administration from the University of Wisconsin School of Medicine and Public Health. I have published more than 40 clinical research papers in peer-reviewed journals on topics including obstetrics, maternal health, addiction medicine, pregnancy complications, and substance abuse during pregnancy.

4. Between 2008 and 2011, I was employed by St. Luke's Hospital in Cedar Rapids, Iowa, as Vice President and Chief Medical Officer. At St. Luke's, I was actively involved in quality, safety, and risk management leadership, serving on the Iowa Health System's IT

Governance Council, the Health Plan Steering Committee, Research and Development Committee, and the Clinical Integration Committee.

5. My medical conclusions are based upon over thirty years of clinical experience treating pregnant women, many of whom suffer from various drug addictions, and familiarity with the large body of research on opiate dependency, buprenorphine, and other treatments.

6. Whenever possible, substance-related disorders that occur during pregnancy should be addressed by a comprehensive approach that respects the pregnant woman's autonomy while attending to clinical concerns regarding both woman and child. Outpatient or inpatient treatment may be appropriate when a qualified medical professional has performed a thorough evaluation of the patient using criteria from the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) and has concluded that a diagnosis of substance dependence is applicable. It is my understanding that such an evaluation was not conducted here.

7. Buprenorphine (brand name Suboxone), the drug for which Ms. Beltran tested positive, is an opioid-assisted maintenance therapy used for the treatment of opioid dependency. ASAM's 2011 Consensus Statement on buprenorphine states that it is considered a reasonable treatment choice for pregnant women with opioid dependency and appears to be safe during pregnancy.

8. In general, opioid-assisted maintenance therapies, such as buprenorphine, diminish withdrawal symptoms and craving, block the euphoric effects of opioids if patients relapse, and enhance the efficacy of psychosocial interventions, such as inpatient or outpatient counseling. The advantages of treating pregnant women using buprenorphine include a lower risk of overdose, fewer drug interactions, and evidence of less severe neonatal abstinence syndrome (infant withdrawal).

9. In the absence of any evidence of adverse impact on the fetus, it is inappropriate to wield legal authority to coerce patients with a history of or current use of substances into inpatient substance abuse treatment. This coercion can have a number of negative ramifications,

many of which flow from the violation of confidentiality and trust at the heart of the patient-physician relationship.

10. The patient-physician relationship is at the heart of medical practice. Communications between doctor and patient, upon which the relationship is built, are the essential medium of practice. Effective communications between patients and practitioners increase the health of patients by increasing the effectiveness, efficiency, and cost-effectiveness of acute, chronic, and preventative health care and also enhance the satisfaction of patients and practitioners.

11. Damage to the patient-physician relationship damages the quality of medical care provided. The trust and open communication that practitioners try to establish with patients is often severely compromised, if not altogether shattered, when the relationship between patient and physician turns from voluntary and collaborative to coerced and even punitive.

12. The patient-physician relationship is particularly important when the patient is pregnant. Because early and regular prenatal care is the primary determinant of infant and maternal health, threatened or coerced treatment is counterproductive to public health goals. For a pregnant woman who uses or has used substances, the knowledge that she may be confined involuntarily or deprived of custody of her child creates a disincentive to seeking early, adequate prenatal care or disclosing vital medical information to her doctor, which in turn diminishes the quality of care for both mother and fetus. Coerced treatment is particularly inappropriate when it has not been established that a patient's use of substances warrants a diagnosis of substance dependence.

13. Wisconsin's statute allowing a court to force a pregnant woman to complete involuntary residential substance abuse treatment reflects a misunderstanding of the medical consensus regarding drug addiction and its recommended treatment. The language of the statute, enacted in 1997, is not consonant with any widely-accepted understanding of addiction medicine, either at the time of passage or now. Moreover, it is clinically inaccurate to assert that a pregnant woman engaging in opioid-assisted therapy using buprenorphine—the standard of care for opioid

dependence—demonstrates habitual lack of self-control in the use of controlled substances. Further, engaging in this form of self-treatment does not square with either or both of two claims: (1) that the pregnant woman is not concerned with the health and well-being of the fetus; and (2) that the pregnant woman's conduct poses a substantial risk to the physical health of the fetus. To apply this statute under the circumstances of Ms. Beltran's case, as presently known, in order to forcibly confine Ms. Beltran in a residential treatment setting is not supported by, and is contrary to, accepted standards of addiction treatment, medical ethics, and public health.

    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and that if called to testify thereto, I could do so competently. Executed this 17th day of September, 2013 in La Crosse, WI.

*Charles Schauberger MD*
_____
Charles Schauberger, M.D.