In the United States District Court
For the District of Wisconsin, Eastern Division

| | |
|---|---|
| Alicia BELTRAN<br><br>Applicant,<br><br>vs.<br><br>Jamie LOEHNIS, in his official capacity as Executive Director of the Casa Clare Treatment Center; Jim STRACHOTA, in his official capacity as Director of Human Services for Washington County, WI; Mark D. BENSEN, in his official capacity as District Attorney for Washington County, WI; the WASHINGTON COUNTY CIRCUIT COURT; and John DOE, in his official capacity as immediate custodian of Applicant Alicia Beltran,<br><br>Respondents. | Docket No._____ |

Declaration of Sharon Stancliff, M.D.

I, Dr. Sharon Stancliff, declare and state as follows:

1. I received my M.D. from the University of California, Davis in 1987 and I am licensed to practice medicine in New York State. I am board certified by the American Academy of Family Medicine as well as being a diplomate of the American Board of Addiction Medicine. I am and have been the Medical Director of the Harm Reduction Coalition since 2005. I am also a consultant to the New York State Department of Health, and to Harlem East Life Plan, a drug treatment program. As a Family Practitioner I have provided obstetrical care to pregnant women and to their children for 8 years. As a drug treatment provider, I have provided methadone and buprenorphine to pregnant women for 16 years.

1

2. I have trained medical providers about drug treatment, drug use in pregnancy and other related issues nationally and internationally as well as publishing over 30 articles and other publications. My Curriculum Vitae is attached as Exhibit A.

3. I have reviewed the medical, social work, and other records regarding Alicia Beltran in order to determine if she habitually lacks self-control in the abuse of controlled substances, exhibited to a severe degree, to the extent that there is a substantial risk that the physical health of the unborn child, and of the child when born, will be seriously affected or endangered unless the she received prompt and adequate treatment for that habitual lack of self-control. While this was the focus of my review of the records, the terms "habitual lack of self-control," "severe degree," "substantial risk," "seriously affected," or "endangered" are medically-recognized or clinically meaningful diagnostic terms.

4. Ms. Beltran had her first prenatal appointment on June 3, 2013, with Dr. Karen Gotwalt when she was 8 weeks pregnant. She told Dr. Gotwalt that she was using Suboxone to gradually stop her self-perceived dependency on Percocet, an opioid. She had her next prenatal care appointment on July 2, 2013 at 12 weeks gestation at the West Bend Clinic. She was seen by Stephanie Weiss PA-C, a physician's assistant. Ms. Weiss offered her a referral to drug treatment and advised her that she would be drug tested through out the pregnancy. According to the Visit and Patient Information form from that July 2 visit listing several diagnoses, Ms. Beltran was diagnosed with a High Risk Pregnancy, Opioid Abuse – Continuous, and Drug Withdrawal. She was administered a urine drug screen which, showed only the presence of buprenorphine. She was scheduled for a 4 week

follow up, the standard of care in a normal pregnancy and apparently was sent home without seeing the supervising physician.

5. Drug test results provide limited information in evaluating and diagnosing drug dependency and addiction. As the United States Department of Justice explains, "Drug tests detect drug use but not impairment. A positive test result, even when confirmed, only indicates that a particular substance is present in the test subject's body tissue. It does not indicate abuse or addiction; recency; frequency, or amount of use; or impairment." U.S. Dept. of Justice, *Drugs, Crime, and the Justice System: A National Report from the Bureau of Justice Statistics* 119 (1992), attached as Exhibit B.

6. Records for Ms. Beltran include only one positive drug test, indicating at most that she had used buprenorphine up to 7 days prior to when she took the drug test performed on July 2, 2013. There are no drug tests or other information to support the claim that she habitually lacked self-control in the abuse of controlled substances, exhibited to a severe degree, at the time she was reported to state authorities. Based on Ms. Beltran's self-report to Ms. Weiss and the tests available to them, there is no basis to support Dr. Angela Breckenridge's conclusion in her July 16, 2013 letter that Ms. Beltran lacked self-control.

7. There is no indication that Dr. Breckenridge ever met the patient or if she is aware of the current recommended treatments for opioid dependency, buprenorphine. Even if she had met with or examined the patient and had made a qualified diagnosis of opioid dependences, her recommendation of mandatory inpatient treatment or incarceration without reference to the availability of buprenorphine or alternative medication-assisted treatments is inexplicable.

8. Buprenorphine is a member of the opioid family; it is used to help patients stop using illicit opioid use, and in many cases it is provided as a regular medication to prevent relapse. It prevents opioid withdrawal symptoms, reduces the urge for other opioids without causing intoxication, and it blocks the effects of other opioids. It is one of two medications that are indicated for women who are dependent on opioids when they become pregnant. Methadone has been used to treat pregnant women since the early 1970's when it was observed that tapering or abruptly stopping opioids during pregnancy could cause miscarriages or premature labor. Buprenorphine or methadone (known as medication assisted treatments "MAT") for the duration of the pregnancy is the standard of care to optimize the health of a pregnancy in an opioid dependent mother. Some infants who are prenatally exposed to opiates and MAT may be born dependent on opioids and some will have signs and symptoms (Neonatal Abstinence Syndrome "NAS") – a transitory and treatable condition. Buprenorphine has been used more recently in pregnancy; one study suggests that it associated with milder Neonatal Abstinence Syndrome for those infants who experience NAS. Some newborns will require medication, but longstanding protocols are used to treat and alleviate these symptoms comfortably.

9. Opioids are not associated with birth defects and there are no known long term consequences.

10. Suboxone is the standard formulation of buprenorphine. It has a small amount of naloxone, which is a deterrent to misuse. Generally, women who become pregnant while on Suboxone are switched to pure buprenorphine in pregnancy to minimize exposure to

unnecessary medication; there is no evidence, however, that the naloxone causes much less is associated with harm to a fetus or child once born.

11. Ms. Beltran shows every indication of trying to have a healthy pregnancy and healthy baby. She entered prenatal care at 8 weeks, which is optimal; unfortunately many women, particularly those who have not graduated high school and have had an unintended pregnancy like Ms. Beltran, enter care long after 12 weeks have passed. She was trying to quit smoking, which is not an easy task but is very important. Smoking during pregnancy can cause poor fetal growth, miscarriage, and premature labor as noted by Ms. Weiss. And finally, she took the risk of reporting her use of un-prescribed controlled medication showing candor and trust in the medical profession. She was concerned about her past use of Percocet and had been using a medication that is prescribed for that purpose, and in fact had been doing so long before she became pregnant. Ideally patients who take any prescription medication would do so under the supervision of a medical provider. In my experience, however, this is not possible for all patients. Common barriers to obtaining formalized medical care include inability to pay, lack of insurance, lack of providers, and inability to find a provider who is accepting new patients or who accepts one's insurance if one has it. Ms. Beltran's decision to attempt a taper from Percocet using Suboxone is consistent with the decisions made by people facing these common barriers.

12. Even if her situation was not ideal, it shows motivation and concern for her health and pregnancy that she self-managed her perceived dependency on prescription opioids and cigarettes. While Ms. Beltran's self-care was not ideal, it was far safer than the treatment (and lack thereof) that she has received under court order.

13. Despite the lack of information supporting their conclusion, health care providers at the West Bend Center and social worker Liddicoat believed that Ms. Beltran lacked self-control in her use of opioids and was dependent on them. I note that if this had been a qualified and correct diagnosis, there is no indication in the records available, that she received appropriate medical care for this diagnosis after her arrest and detention. Although nothing in the records support the view that she was still dependent upon opioids or needed to continue treatment with Suboxone to avoid withdrawal or relapse, if she had been, the interventions taken by the state could have caused a miscarriage. The state took her into custody and put her in a program that does not provide medication-assisted treatments of any kind. Abrupt withdrawal creates the greatest risk to the fetus, more so than any reported activities on the part of Ms. Beltran.

14. Again, despite the lack of information supporting this conclusion, health care providers at the West Bend Center and social worker Liddicoat apparently also concluded that Ms. Beltran was at high risk for relapse. If she had been, this would also be an indication for her to be evaluated for continuation of buprenorphine a treatment unavailable at any of the locations where she was and is currently being detained.

15. Based on my independent research, including the websites for Casa Clare, the Substance Abuse and Mental Health Service Administration (SAHMSA), and the American Board of Addiction Medicine, the selected treatment facility Casa Clare where Ms. Beltran is being held apparently has no capacity to provide buprenorphine. The Medical Director, Dr. John Buttita, is boarded in Internal Medicine, which offers little training in Obstetrics. Furthermore, he is not certified by the American Board of Addiction Medicine despite being the Medical Director of a drug treatment program for 7 years, and he is not

listed by SAMHSA as a certified buprenorphine provider. There is no indication that any of the medical or social service staff involved in this case have any understanding of the appropriate medical treatment of opioid dependence in pregnancy.

16. Primary care providers receive little training on substance use and addiction. This a problem described by the National Center on Addiction and Substance Abuse at Columbia University, which notes that physicians "lack the basic education and training in addiction medicine that is needed to understand the science of addiction, translate research evidence into practice, screen for risky use, diagnose and provide treatment for addiction and the broad range of co-occurring health problems, or refer patients to other specialists as needed." *See* National Center on Addiction and Substance Abuse at Columbia University, *Addiction Medicine: Closing the Gap Between Science and Practice*, 2012. Attached as Exhibit C.

17. Her admission records at Casa Clare are also of concern. The "Treatment Service Qualifying Criteria" form filled out on July 19, 2013 by Jane D. Zaretzke at Casa Clare include that as a result of her drug use Ms. Beltran's work was compromised, she had spent time in jail, and that her use caused family worry: all of which were caused by the arrest and detention in this case. There was no history of long-term drug use (nor even current use at the time this form was filled in, according to the drug test performed upon her admission to Casa Clare) and thus no evidence that she was at high risk of relapse. Moreover, her determination to quit has been documented. Finally there is no evidence that her use of drugs "compromises health of child" as suggested by the instrument.

18. Based on my 8 years of past experience as a medical director of a drug treatment program, I would not sign off on an admission such as this, and I would be concerned

that it would be considered highly questionable, possibly fraudulent, in an audit by Medicaid. There is no apparent reason qualifying her for residential treatment.

19. Based on my review of all the records there is nothing that justifies her continued involuntary residential treatment. Moreover, detention in the residential facility is contradicted by both the recommendations of Dr. Gotwalt and by the "Treatment Service Qualifying Criteria" conducted in August 20, 2013 by Mr. Borden at Genesis. Yet, Ms. Beltran remains confined to the residential setting.

20. To conclude, there is no evidence that Ms. Beltran fits the criteria of an expectant mother who habitually lacks self-control in the use of alcohol beverages, controlled substances or controlled substance analogs, exhibited to a severe degree, to the extent that there is a substantial risk that the physical health of the unborn child, and of the child when born, will be seriously affected or endangered unless the expectant mother receives prompt and adequate treatment for that habitual lack of self-control.

21. There is no demonstration of habitual lack of control nor of a substantial risk if she does not receive state-forced treatment. In fact, in this case the treatment imposed by the court has had the potential to cause far more harm; the diagnosis of opioid dependence did not receive medical evaluation by a qualified physician and she was placed in a very stressful environment which is likely to sabotage her attempts to quit smoking. Furthermore stress is increasingly recognized as a harmful in pregnancy. Ms. Beltran should return home immediately and be followed up by a sympathetic obstetrician.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed on September 23, 2013

S. Stancliff
Sharon Stancliff, M.D.