# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| **Alicia BELTRAN** )<br>)<br>Applicant, )<br>)<br>vs. )<br>)<br>**Jamie LOEHNIS**, in his official capacity as )<br>Executive Director of the Casa Clare )<br>Treatment Center; **Jim STRACHOTA**, )<br>in his official capacity as Director of Human )<br>Services for Washington County, WI; )<br>**Mark D. BENSEN**, in his official capacity as )<br>District Attorney for Washington County, )<br>WI; the **WASHINGTON COUNTY** )<br>**CIRCUIT COURT**; and **John DOE**, in his )<br>official capacity as immediate custodian )<br>of Applicant Alicia Beltran, )<br>)<br>Respondents. ) | **Docket No.**_____ |

Declaration of Sonia Fritsche

I, Sonia Fritsche, declare and state as follows:

1. I reside at 6678 North 42nd Street, in Milwaukee, Wisconsin 53209.

2. I am the mother of Alicia Beltran, a competent 28 year-old woman who is currently pregnant. My daughter, Alicia Beltran, was functioning well and was making good, healthy choices when she was forcibly detained for no good reason and against her rights. She is presently being held against her will under court order at Casa Clare, an in-patient treatment facility in Appleton, Wisconsin. She is not free to leave.

1

3. On May 18, 2013, I was on my way to meet with Alicia at her apartment in Jackson when I received a call from her asking me to purchase a home pregnancy test for her. Alicia took the test that day and discovered she was pregnant.

4. I assisted Alicia in finding prenatal care by setting up an appointment with Dr. Karen Gotwalt, who had treated Alicia for an ectopic pregnancy approximately three years ago. Because of her history of ectopic pregnancy, she was scheduled for an ultrasound to confirm the position of the pregnancy on May 21, 2013, at St. Joseph's Hospital, Milwaukee, Wisconsin. She was also scheduled for an appointment with Dr. Gotwalt on May 31, 2013.

5. I was Dr. Gotwalt's medical assistant. Even though I worked for Dr. Gotwalt, she would not breach patient confidentiality.

6. According to Alicia, she was forthcoming with Dr. Gotwalt about a time in the previous year when she had difficulty with her use of Percocet, which she started taking to deal with the stress she felt in her life at that time. I was aware of this because I had supported and assisted her in her efforts to quit. Alicia came to me in October of 2012 and disclosed that she had been taking Percocet to get through work and was stopping its use. On November 12, 2012, I received a phone call from Alicia while I was at work, saying that she had stopped taking Percocet and was very ill. I left work and picked her up at her apartment in Jackson and took her to the emergency room at St. Joseph's Hospital, West Bend, Wisconsin. She was given fluids and medication to help with withdrawal symptoms. We were told that this was the worst of it because she was already days into her quitting. I took a family leave of absence from November 12, 2012, through November 16, 2012, to assist in her recovery. She stayed at my home and took no

medication other one prescribed to help with anxiety. Alicia could not afford Suboxone to help with her recovery, because she had no insurance and we were told that Suboxone would cost $600 a month.

7. After her appointment with Dr. Gotwalt, Alicia decided that she needed to find a doctor closer to her home in Jackson, Wisconsin, due to the cost of travelling to Dr. Gotwalt's office in Wauwatosa, Wisconsin. Alicia's sister Andrea found Dr. Angela Breckenridge on the Internet. An appointment was made with Dr. Breckenridge for July 2, 2013.

8. On July 2, 2013, I received a call from Alicia telling me that she had attended her appointment and had seen Stephanie Weiss, a Physician's Assistant. She reported feeling bullied by Ms. Weiss and a nurse in the office because they wanted her to go on a prescription for Suboxone. Alicia said that she did not want to go on the medication, and told this to Ms. Weiss and the nurse, because she had successfully quit taking Suboxone and did not need or want it anymore.

9. On the morning of July 18, 2013, Alicia called me at work and informed me that she was being arrested and that they were taking her to the hospital to be checked out. I asked her if she was read her rights, and she said she had been. I advised her not to say anything or sign anything until I got her an attorney. She said she was handcuffed at that time. She later called me from the hospital crying and said she didn't understand what was going on, and that even though the doctor said she was fine, they were still arresting her and taking her to jail. She told me that the doctor advised the officers who had arrested her that he did not feel that arrest and inpatient treatment were necessary and gave them pamphlets on outpatient treatment, and informed them it was not mandatory. She called again,

approximately one hour after discharge from the hospital, and said she was being taken to jail from the hospital.

10. Later in the evening of July 18, 2013, about 4:30 - 5:00 p.m., I received a call from Alicia telling me that she was being taken by a social worker to a rehab clinic until a bed opened up at a treatment facility in Appleton. She said that she had been the subject of a proceeding before a judge, and that even though she repeatedly asked for an attorney, she was not provided one, and was eventually told that she would not get an attorney for that proceeding. Alicia told me that the attorneys, judge, and social worker all talked among themselves, and that she did not understand what was going on.

11. After I hung up with Alicia, I called the public defender's office in Washington County, Wisconsin, to find out who Alicia's attorney was. I was told by the public defender's office that they had no record or knowledge of my daughter or her case. They told me that their office would not have been appointed to represent her because they only take cases in which there is a criminal charge. I was told that they would be unable to represent her unless they received a request from the court.

12. Because it appeared that my daughter would not be appointed an attorney at all, I hired Ann Rothstein, an attorney who had represented a family member in another matter.

13. The following day, July19, 2013, Alicia called me to tell me that she was being transported from Calm Harbor to Casa Clare in Appleton, Wisconsin. She was very distraught and told me that she would rather have an abortion than be locked up. She was under the impression that she would be held for 28 days and have a hearing on August 15, 2013.

14. At 10:39 a.m. that day, I received a voice mail message from social worker Jodi Liddicoat. I returned her call on my lunch break later that day. Ms. Liddicoat said that she was giving me a courtesy call to let me know that my daughter was being held at Casa Clare. She said that the reason for the arrest and hold was Alicia's drug use, and that they were protecting my daughter's unborn child. I asked Ms. Liddicoat why my daughter had not been allowed to consult with an attorney, and Ms. Liddicoat insisted twice that she had been represented by an appointed attorney from the public defender's office. I informed Ms. Liddicoat that I had spoken to the public defender's office and that they had no record of my daughter whatsoever. I told Ms. Liddicoat that my daughter was only 12 weeks pregnant and asked why she was being locked up if she still had the right to have an abortion. Ms. Liddicoat told me that if Alicia wanted to have an abortion, she would need to get a lawyer. At that point she sounded upset and told me that she could not tell me anything else because of confidentiality. I informed her that Alicia had signed consent forms at Casa Clare to release information and discuss her case with me, but Ms. Liddicoat said that no consent had been signed for her office.

15. That afternoon, I called Casa Clare to let them know that Alicia was being represented by Attorney Ann Rothstein, and they asked if I knew what was going on and if Alicia would be staying there.

16. On July 21, 2013, I reached out to Dr. Karen Gotwalt, whom Alicia had seen for her first prenatal care visit, to tell her what was happening. Dr. Gotwalt was very concerned about patient confidentiality, and that arrests and involuntary commitments would be a deterrent to drug-using women from seeking prenatal care. She wrote a letter on my daughter's behalf, expressing her opinion that Alicia does not need to be in inpatient

treatment, is very motivated to decrease her drug use, that she has very supportive family, and that she has a very good chance of being drug free. A copy of that letter is attached to this affidavit as Exhibit A.

17. That day I faxed a letter to Attorney Ann Rothstein. I included letters from Dr. Gotwalt and Alicia's employer for her to give to the District Attorney. The letters detailed my daughter's situation and asked that she be released to my care so that she could continue to get prenatal care and obtain outpatient treatment. I assume that Attorney Rothstein provided that information to the District Attorney.

18. On July 23, 2013, I received a call from Alicia telling me that her Attorney Ann Rothstein had informed her that she would have to stay at Casa Clare. I called Attorney Rothstein to find out what had happened, and Attorney Ann Rothstein reported that she had been told that Alicia was "uncooperative" and that she was "one of the worst cases Casa Clare had ever had." I called Casa Clare to find out if this was true, because a counselor named Connie had previously reported to me that Alicia was doing very well and was very nice except for refusing to sign papers without an attorney present to explain them. The person I spoke to denied that anyone had called Alicia uncooperative and became very upset. When I called Attorney Rothstein to inform her of this, all she said was "this is f\_\_\_\_'d up." I told Attorney Rothstein that we were waiting for her to review the forms Alicia had been asked to sign by Casa Clare and she advised me to tell my daughter to sign the forms because she was under court order and she would be sent to jail if she did not sign.

19. I left work early and again called Attorney Rothstein later that day to find out what had happened in her meeting with Social Services, the District Attorney, and the Guardian Ad

Litem that morning. I told her something had to be done, and she said we were "messing with the f_____ing government." She either hung up or was disconnected, and I tried to call her back repeatedly but was unable to reach her. we had no further communication about Alicia's case.

20. After my phone call with Attorney Rothstein, I called my sister Tina. I went to her house, where we were met by my other daughter, Andrea, to come up with a plan. We went onto the Internet to try and find someone or someplace that would help her. I sent emails to National Advocates for Pregnant Women and to the American Civil Liberties Union begging for help for my daughter. I continued to do research and reading and eventually found a private attorney named Linda Vanden Heuvel who agreed to take my daughter's case. I was able to schedule an appointment with Attorney Vanden Heuvel that afternoon, and retained her that same day. She advised us to have a plan in place prior to the previously scheduled August 15, 2013 proceeding. So we made an appointment with Genesis Behavioral Services in Appleton for August 20, 2013.

21. On July 30, 2013, at Jodi Liddicoat's instruction, Alicia had a prenatal checkup with a doctor in Appleton, Wisconsin. Ms. Liddicoat had told the staff to tell Alicia that she needed to be seen and it was up to us to find a provider. I found the doctor on the Internet based on their proximity to Casa Clare. Alicia's counselor transported her to this appointment. From what Alicia told me, she spent only a very short time with this doctor.

22. On August 15, I drove to Appleton to pick up Alicia for her proceeding because Casa Clare does not provide transportation to court appearances. We were instructed by Casa Clare to take her belongings in case she was released.

7

Case 2:13-cv-01101-CNC   Filed 09/30/13   Page 7 of 11   Document 11

23. The August 15 proceeding would be the first one at which Alicia was represented by counsel.

24. Prior to the start of the August 15 proceeding, we had a meeting, which included Alicia, Attorney Vanden Heuvel, the Guardian Ad Litem, as well as Alicia's sister Andrea and my sister Tina. The Guardian Ad Litem informed us that she usually sides with Social Services. Attorney Linda S. Vanden Heuvel and I asked how they were justified in keeping Alicia based on court documents claiming that she had tested positive for opiates when she had taken a urine drug test during her July 2, 2013, prenatal checkup that showed that she was negative for opiates. We showed her the test results, which she took to show the District Attorney and social worker Jodi Liddicoat. The Guardian Ad Litem reminded Alicia that she had torn up her business card during the July 18, 2013, proceeding and asked whether she remembered doing so. I informed the Guardian Ad Litem that Alicia had decided to continue her prenatal care with Dr. Gotwalt, and that our family would drive her and pay costs. We were willing to do this even though the travel was very costly for us, taking eight hours of driving for each appointment: two hours from my home to Casa Clare, two hours from Casa Clare to the prenatal appointment, two hours back to Casa Clare, and two hours back to my home. Prior to Alicia being allowed overnight passes, all of this driving had to be completed in a single day. I explained that we felt that it was important that she have a consistent and stable relationship with Dr. Gotwalt, since she would be the one delivering the baby. The Guardian Ad Litem replied that they were skeptical about this plan because they felt Dr. Gotwalt was a mandatory reporter and instead of reporting Alicia, Dr. Gotwalt tried to protect her. The Guardian Ad Litem claimed that Alicia had a good rapport with the

8

Case 2:13-cv-01101-CNC    Filed 09/30/13    Page 8 of 11    Document 11

doctor she saw once in Appleton, even though Alicia did not even know his name and only saw him for a fifteen minute visit, acknowledging that he had not reviewed her medical records.

25. It is my understanding that prior to the proceeding, Attorney Vanden Heuvel spoke with the Guardian Ad Litem, Social Worker and Assistant District Attorney. Attorney Vanden Heuvel told me what happened. She said that she discussed the July 2, 2013, negative drug test and the failure of Dr. Angela Breckenridge (the Dr. whose letter they were relying on to keep my daughter in custody) to ever see or examine Alicia. She told me that the District Attorney was "not going to budge," and that Alicia would have to enter a denial on the record at the proceeding and request a trial.

26. I was only allowed to attend the proceeding because the sheriff obtained special permission for my admission at the request of Attorney Vanden Heuvel. I was instructed to sit at the back of the courtroom and to remain silent. It was decided by the Court Commissioner, Guardian Ad Litem, District Attorney, Social Services, and Renae who works for Social Services and funds Alicia's stay at Casa Clare, that Alicia would stay in Casa Clare for 90 days. Attorney Vanden Heuvel requested a jury trial, which was set for the end of October after Alicia has served the full 90 days. This August 15 conference was not an opportunity for Alicia or her attorney to confront witnesses against her or to present evidence, although Attorney Vanden Heuvel did advise the court of the July 2, 2013, drug test and the failure of Dr. Breckenridge to even examine Alicia. I drove Alicia back to Casa Clare after the proceeding.

27. Shortly after I dropped Alicia at Casa Clare, she called me saying that Noel Shultz, her counselor, received an email from Jodi Liddicoat saying that Alicia needed to cancel her

assessment with Genesis Behavioral Group because Alicia was inpatient and would not be attending outpatient treatment. I discussed this with Attorney Vanden Heuvel, who had recommended that we set up the appointment, and she told me that Alicia should keep the appointment. Ms. Liddicoat became aware of the Genesis appointment at the August 15, 2013 proceeding. We were told at the beginning of Alicia's stay at Casa Clare by another worker, Connie, that normally patients have assessment prior to being brought in.

28. I picked Alicia up on August 20 for her appointment at Genesis, where she was seen by a psychotherapist named Christopher Borden. After the assessment, he called me and told me that he checked his answering machine after we left and that there was a message from Jodi Liddicoat requesting a return call. He told me that he returned her call and shared with her his recommendation that Alicia be placed in outpatient treatment with weekly drug testing.

29. Casa Clare does not provide Alicia with transportation, so I have driven her to all of her medical appointments, including prenatal care. It takes us two hours to drive from Casa Clare in Appleton to Alicia's Ob/Gyn Dr. Karen Gotwalt in Wauwatosa, and two hours to drive back.

30. This situation is very difficult for me because of my work schedule. I am a dialysis patient care tech in Wauwatosa, Wisconsin, and work 12-hour shifts. I worry about the amount of time I have been forced to devote to trying to get my daughter released, including multiple trips to sign forms, make copies, and send her money. I cannot afford to lose my job. I pay Alicia's phone bill and send money to her so that she can purchase

10

Case 2:13-cv-01101-CNC   Filed 09/30/13   Page 10 of 11   Document 11

necessities like toiletries, and will need to provide her with financial help once she is released because she has lost her own job due to the length of her incarceration.

31. I am able to visit my daughter on weekends. We visited once during the week because visits are only from 8:30 p.m. to 9:30 p.m., and it was too late to be driving home. So we take turns on weekends, but we cannot always make it. There are some weekends that Alicia has no visitors. With Alicia now being past the 30 days, she is classified as a security level 1A, which means that she can request 24-hour passes, so we now try to schedule home/family visits to coincide with her doctor appointments. We just found out that on the weekend of September 14, 2013, weekend passes are available with consent.

32. I am concerned about her pregnancy. After she learned she was pregnant, Alicia had become more aware of her own health and had successfully reduced her smoking, managing to cut back to just 3 cigarettes per day prior to her arrest. After this forced detention and incarceration, Alicia has been smoking frequently. She has not received any medication that would have helped prevent her from experiencing withdrawal symptoms if she had been addicted to drugs when they detained her; luckily Alicia had actually overcome her difficulties before they incarcerated her because the situation offered nothing to help her. My daughter is under severe stress, and I am concerned about her health due to the stress.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on September __27__, 2013

                _____s/ Sonia Fritsche___
                Sonia Fritsche